Westlaw

Page 1

Not Reported in B.R., 2005 WL 1287920 (Bkrtcy.M.D.N.C.)
**(Cite as: 2005 WL 1287920 (Bkrtcy.M.D.N.C.))**

Only the Westlaw citation is currently available.

United States Bankruptcy Court,
M.D. North Carolina.
In re: GRIFFIN SERVICES, INC., Debtors.
Bruce MAGERS, Chapter 7 Trustee for Griffin Services Inc., Plaintiff,
v.
THE HOLLAND GROUP OF TENNESSEE, INC., and Stacy Almond, Defendants.
**No. 01-52373, 03-6114.**

March 2, 2005.

R. Bradford Leggett, Winston-Salem, NC, for Debtor.

MEMORANDUM OPINION

CARRUTHERS, Bankruptcy J.

*1 This matter came before the Court on January 12, 2005, upon cross Motions for Summary Judgment. Peter Juran and Jeanette Stark appeared on behalf of Bruce Magers, Chapter 7 Trustee. Alan Ruley, Stanley Graham and Keli Stewart appeared on behalf of The Holland Group of Tennessee, Inc. and Stacy Almond. The Court, after considering the arguments of counsel, the exhibits, and the pleadings, makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

Background

Prior to 2001, Griffin Services, Inc. (the "Debtor" or "Griffin"), a staffing agency, developed a network of offices throughout North Carolina. The offices of particular relevance to this litigation were located in Albemarle, Concord, Salisbury, Winston-Salem, and Asheboro. Each office was staffed by managers employed subject to written employment agreements containing non-disclosure and non-compete provisions. In the Spring of 2001, the Debtor encountered serious financial difficulties, and its primary lender, Lighthouse Financial Corp. ("Lighthouse"), insisted that the Debtor employ a workout specialist, Deidrich Von Soosten. After familiarizing himself with the Debtor's financial situation, Von Soosten sent a general information packet to a number of potential buyers regarding the sale of the company. At least one of those potential buyers, the Holland Group ("Holland"), expressed interest, and executed a Confidentiality Agreement ("Confidentiality Agreement") in order to receive additional information from the Debtor.

Holland is a Tennessee-based provider of human resources. In early 2001, Holland had just one client in North Carolina and was seeking to further expand its business into North Carolina. A month after Holland signed the Confidentiality Agreement, Holland submitted a non-binding letter of intent to the Debtor indicating its intention to proceed with the due diligence work necessary to negotiate a purchase agreement. In response, the Debtor provided Holland with information and due diligence items including: staff, legal and branch information; customer lists and contact information; employee salary and benefit information; competitor lists; and various internal analyses of gross margins, staffing, and customers. On September 12, 2001, Holland made a formal offer of two million dollars to purchase the Debtor's assets conditioned upon Lighthouse subordinating its debt to that of Holland's primary lender. Closing was scheduled for October 5, 2001.

As the closing date approached, Holland continued to receive information regarding all aspects of the Debtor's business in preparation for the purchase. During the week of the scheduled closing, Holland personnel accompanied the Debtor's employees on visits to the Debtor's key clients. The goal of these meetings was to provide an introduction of Holland to the clients and thereby facilitate a smooth trans-

Page 2

Not Reported in B.R., 2005 WL 1287920 (Bkrtcy.M.D.N.C.)
**(Cite as: 2005 WL 1287920 (Bkrtcy.M.D.N.C.))**

ition of those clients to Holland. On October 4, 2001, the day before the scheduled closing, Lighthouse informed the parties that it would not subordinate its debt to Holland's lender. Holland immediately called off the purchase. On that same day, an Involuntary Petition was filed against the Debtor by Atlantic Mutual Insurance Company.

**\*2** The combination of the Involuntary Petition and the loss of the sale to Holland led the Debtor to reconsider an offer from Rolan, Inc. ("Rolan"), which had previously made an offer to purchase the Debtor's business in August 2001. Rolan's offer had been rejected, but the parties entered into a new letter of intent on October 17, 2001. The letter of intent called for the assignment of all accounts receivable to Rolan, which were to be collected and remitted to the Debtor (or its secured lender, Lighthouse) after charging a collected fee. Additionally, the Debtor's offices were all to be purchased by Rolan with payment to the Debtor based upon a percentage of gross margin dollars, depending on the revenue produced by those offices over a period of 18 months.

Meanwhile, the week after the sale to Holland fell through, Holland hired five employees of the Debtor: Stacy Almond, branch manager of the Albemarle office; Anna Locklear, area manager out of the Concord office; Ann Stewart, area manager out of the Salisbury office; Donna Weatherholtz, branch manager out of the Asheboro office; and Kathryn Frazier, area manager out of the Asheboro office (hereinafter "Former Griffin Employees"). According to Holland, its staff informed the Former Griffin Employees that they would be unable to speak with any Former Griffin Employees until Holland was provided with proof that they had terminated their employment with the Debtor. After copies of resignation letters were faxed to Holland by each Former Griffin Employee, offers of employment were extended. Holland was already acquainted with the Former Griffin Employees as a result of the due diligence process with the Debtor, and Holland has admitted that it would not have hired these individuals in this manner but for its introduction to them during the due diligence process. The Former Griffin Employees were brought to Tennessee for a week of training in mid October 2001 and then returned to North Carolina to begin their work for Holland.

By letter dated October 19, 2001, the Debtor's counsel informed Holland that entering into employment contracts with the Former Griffin Employees would violate the Confidentiality Agreement as well as the individual employees' employment contracts. The Debtor's counsel followed up with a second letter on October 22, 2001. Holland denied that its hiring of the Former Griffin Employees breached any of these contracts.

On October 31, 2001, the Debtor's motion to convert the involuntary case from Chapter 7 to a voluntary Chapter 11 case was granted, and an order for relief was entered. The court approved the purchase of the Debtor's assets by Rolan on November 2, 2001, and the court entered an order accordingly ("Sale Order"). In the Sale Order, the court found that since the purchase price was performance based, it could not be determined with certainty. However, the evidence reflected that based upon the Debtor's current level of sales, the payments to be received for the benefit of the estate could range from $476,190 to $1,225,440 with a likely recovery of $1,058,580. The court further found that the liquidation value of the tangible assets to be sold to Rolan would probably not exceed $26,000.

**\*3** On December 6, 2001, the court entered an order converting the bankruptcy proceeding from a case under Chapter 11 of the Bankruptcy Code to a case under Chapter 7 of the Bankruptcy Code. Bruce Magers was appointed as Chapter 7 trustee (the "Trustee"). In the course of bankruptcy proceedings, several disputes arose, including disputes between Griffin, the principals of Griffin, Rolan, and Holland. Unfortunately, the total revenue ultimately received by Rolan was lower than anticipated, and the Debtor received only $319,272. The Trustee contends that this low figure can only be

Not Reported in B.R., 2005 WL 1287920 (Bkrtcy.M.D.N.C.)
**(Cite as: 2005 WL 1287920 (Bkrtcy.M.D.N.C.))**

explained by the fact that a number of the Debtor's customers did not give their business to Rolan, but instead utilized Holland. The Trustee contends that Holland's records indicate that during the eighteen-month period following the Rolan sale, it received total revenue of $5,712,330 from its operations out of the five offices opened in former Griffin territory. Of this total revenue, $4,291,746 was revenue from servicing former Griffin clients. The disputes between Rolan and Griffin were resolved, and Rolan assigned any claims it might have against Holland to the bankruptcy estate.

On August 27, 2003, the Trustee filed this adversary proceeding asserting the following claims (1) breach of contract against defendant Holland; (2) interference with contract against defendant Holland; (3) breach of contract against defendant Almond; [FN1] and (4) unfair and deceptive business practices against defendant Holland. On November 12, 2003, Almond, Holland and the Trustee entered into a joint scheduling memorandum, and the parties proceeded with discovery. At the conclusion of the discovery period, the parties filed the present dispositive motions seeking summary judgment.

> FN1. The Complaint also names Donna Weatherholtz as a defendant for this claim, but the Trustee filed a voluntary dismissal of that claim on April 21, 2004.

The Standard for Summary Judgment

The standard for summary judgment is set forth in Fed.R.Civ.P. 56, which is made applicable to this proceeding by Bankruptcy Rule 7056, and provides that the movant will prevail on a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant has the initial burden of establishing that there is an absence of any genuine issue of material fact, and all reasonable inferences must be drawn in favor of the nonmoving party. *Id*. Once the moving party satisfies that burden, the burden shifts to the nonmoving party to present some evidence of a genuine issue of material fact. *Id*. To meet its burden, the nonmoving party is required to present evidentiary support for every essential element of its case and upon which it bears the burden of proof at trial. *Id*. The nonmoving party cannot "create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Harleysville Mut. Ins. Co. v. Packer,* 60 F.3d 1116, 1120 (4th Cir.1995) (citing *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985).

Conclusions of Law

1. 28 U.S.C. § 157(b)

**\*4** As a preliminary matter, the parties dispute whether the present action is a core or non-core proceeding. A bankruptcy court has the right to "hear and determine all cases under title 11, and all core proceedings arising under title 11, or arising in a case under title 11 ... and may enter appropriate orders and judgments." 28 U.S.C. § 157(b)(1). A bankruptcy court may also hear a non-core proceedings, but the court is limited to submitting proposed findings of fact and conclusions of law to the district court, which must review those findings and conclusions de novo. 28 U.S.C. § 157(c)(1). Section 157(b)(2) provides a non-exclusive list of examples of core proceedings, yet the distinction between core and non-core remains unclear. *In re Apex Express Corp.,* 190 F.3d 624 (4th Cir.1999). In *Apex Express,* the Fourth Circuit considered whether an account receivable claim that was based upon a prepetition breach of a prepetition contract was a core proceeding. The court held that such a claim, when grounded in state law and arising prepetition, must be treated as non-core. *Id*. at 631. In making this determination, the court examined the distinction between public rights and private rights

Page 4

Not Reported in B.R., 2005 WL 1287920 (Bkrtcy.M.D.N.C.)
**(Cite as: 2005 WL 1287920 (Bkrtcy.M.D.N.C.))**

as set forth in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). In *Northern Pipeline,* the Supreme Court found that the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, and is a public right. *Northern Pipeline,* 458 U.S. at 71, 102 S.Ct. 2858, 73 L.Ed.2d 598. Therefore, the Fourth Circuit concluded that "[b]ecause the public right nature of bankruptcy proceedings gives Congress the power to assign judicial functions to non-Article III bankruptcy courts, the core/non-core distinction should depend upon the connection the claim has to this public right." *In re Apex Express Corp.,* 190 F.3d at 632.

The Hollands contend that *Apex Express* is controlling in this case because the Trustee's claims stem from prepetition contract rights. Unlike *Apex Express,* in this case the Trustee is not simply seeking to recover potential assets of the estate by pursuing prepetition claims, he is seeking to recover damages for post-petition acts by the Defendants and is asserting both contract and tort claims. Numerous courts have found that claims based upon post-petition conduct may be core. *In re East Hill Manufacturing Corp.,* 200 B.R. 535 (D.Vt.1996) (post-petition breach of a preptition non-competition agreement is core); *In re Nutri/System, Inc.,* 159 B.R. 725 (E.D.Pa.1993) (post-petition breach of prepetition contract is core because it relates to the administration of the estate); *Hughes-Bechtol, Inc. v. Construction Mgmt., Inc.,* 144 B.R. 755 (S.D.Ohio 1992) (claim related to prepetition construction contract for which the majority of the work was performed post-petition was core).

Here, the claims asserted by the Trustee are closely tied to the bankruptcy proceeding. The alleged breach of contract and tort-based claims occurred post-petition, directly damaging the estate and its creditors. In essence, while the Debtor's creditors turned to the bankruptcy court to seek a fair and equitable distribution of the Debtor's assets in an involuntary Chapter 7 proceeding, the Defendants were allegedly misappropriating the Debtor's most valuable assets: its clients and confidential information. Then, while the Debtor was in the process of seeking court approval for the sale of its assets to Rolan pursuant to 11 U.S.C. § 363, Holland was using the misappropriated confidential information to systematically establish competing offices. The Trustee's claims are based upon the Defendants' alleged interference with the profits that could have been generated as a result of the approved § 363 sale. Thus, the Defendants' actions undermined the bankruptcy process and this court's Sale Order. Based on the foregoing, the court finds that this adversary proceeding is a core proceeding.

2. Service of Process

**\*5** Stacy Almond asserts that the Complaint must be dismissed on the grounds that the summons and complaint were not timely served on her. The Trustee was required to serve a summons and complaint upon each named defendant within 120 days of the filing of the complaint in accordance with Federal Rule of Civil Procedure 4(m), which provides in part:

> If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m). Nevertheless, undue delay in challenging personal jurisdiction may result in a waiver, even where the defense is asserted in a timely answer. *Datskow v. Teledyne, Inc.,* 899 F.2d 1298 (2nd Cir.1990). "Additionally, a party's conduct evidencing that it has submitted itself to the court's jurisdiction will constitute a waiver of insufficient service of process." *In re Lefler,* 319 B.R.

Page 5

Not Reported in B.R., 2005 WL 1287920 (Bkrtcy.M.D.N.C.)
**(Cite as: 2005 WL 1287920 (Bkrtcy.M.D.N.C.))**

538, 541 (Bankr.E.D.Tenn.2004) (citing *Slone-Stiver v. Mazer Corp.,* 223 B.R. 116, 122 (Bankr.S.D.Ohio 1998)).

In this case, it is clear that the Trustee failed to properly serve Stacy Almond within 120 days of filing the Complaint and Stacy Almond did raise the defense of insufficient service of process in her Answer. Rather than immediately filing a motion to dismiss, however, Ms. Almond filed a scheduling memorandum with this court and participated in the full discovery process, including a deposition and written discovery. Ms. Almond participated in this case for over a year before electing to raise this issue in her brief in support of summary judgment. The court finds that Ms. Almond's conduct bars her from complaining about the defective form of service.

Even if Ms. Almond's conduct did not result in a waiver of service of process, the court finds that, based on Ms. Almond's conduct, the Trustee has demonstrated good cause for the failure to properly serve Ms. Almond. Rule 4(m) provides that the court may extend the time for service if the plaintiff shows good cause for a failure to do so. "Courts generally treat Rule 4 as a flexible rule that should be liberally construed so long as a party receives sufficient notice of the complaint." *U.S. v. 630 Ardmore Drive,* 178 F.Supp.2d 572, 578 (M.D.N.C.,2001) (quoting *Benny v. Pipes,* 799 F.2d 489, 492 (9th Cir.1986)). *See also Armco. Inc. v. Penrod-Stauffer Bldg. Systems, Inc.,* 733 F.2d 1087, 1089 (4th Cir.1984) ("When there is actual notice, every technical violation of the rule or failure of strict compliance may not invalidate the service of process"). While the court does not look lightly upon the failure to comply with the notice requirements of Rule 4, the court has no indication that granting the Trustee extra time to perfect service will result in a great prejudice on Ms. Almond, given that Ms. Almond has already participated in a significant portion of the litigation. Under the circumstances of this adversary proceeding, the court declines to dismiss the case and instead finds it more appropriate to direct the Trustee to perfect service within the time period as specified in the accompanying order.

3. Breach of Contract against Holland

**\*6** The Trustee's first claim for relief alleges that Holland breached its Confidentiality Agreement with Griffin. The Confidentiality Agreement provided that Griffin would furnish Holland with confidential and proprietary information (the "Evaluation Material") and that Holland would use the Evaluation Material solely for the purpose of evaluating the proposed purchase of Griffin. The Trustee contends that Holland used the Evaluation Material it obtained during the negotiation process with Griffin to expand its business into North Carolina in breach of the Confidentiality Agreement.

In support of this claim, the Trustee has provided evidence that tends to establish the following sequence of events: In early 2001, Holland had one client in North Carolina, Thomasville Furniture. In the spring of 2001, Holland began to investigate the possibility of expanding its operations in North Carolina. Holland hired Joel McIntyre, who had previous experience in the North Carolina staffing industry. McIntyre did not obtain any clients for Holland in North Carolina; however, in July 2001, McIntyre put Holland in touch with Griffin and the parties entered into the Confidentiality Agreement. During the ensuing months, Griffin supplied Holland with extensive information regarding all aspects of its business. By letter dated September 12, 2001, Holland made an offer of $2,000,000 to purchase Griffin's assets. The parties scheduled the closing for October 5, 2001.

On October 4, 2001, the day before Holland was scheduled to purchase Griffin, Holland called off the closing. By the end of that same month, Holland had hired the five Former Griffin Employees including Stacy Almond, Anna Locklear, Ann Stewart, Donna Weatherholtz, and Kathryn Frazier. Holland had received extensive information from

Not Reported in B.R., 2005 WL 1287920 (Bkrtcy.M.D.N.C.)
**(Cite as: 2005 WL 1287920 (Bkrtcy.M.D.N.C.))**

Griffin regarding each of these individuals during the due diligence process. Locklear, Stewart, Weatherholtz, and Frazier each filled out applications for employment, received offers for employment and began a week of training at Holland's offices in Murfeesboro, Tennessee on October 15, 2001. Each of these individuals had received a verbal offer for employment from Holland sometime prior to their arrival in Murfeesboro. Almond filled out an application for employment, received an offer for employment, and began her training in Murfeesboro on October 22, 2001. She too had received a verbal offer for employment prior to October 22.

Following their training, Locklear, Almond, Weatherholtz, and Frazier each returned to North Carolina to establish a Holland office in the same city in which their former Griffin offices had been located. Stewart, who had been located in the Salisbury office, was sent to Winston-Salem to establish an office. Griffin's former Winston-Salem area manager had resigned from Griffin prior to the scheduled closing. In notes sent to Holland in preparation for the purchase, John Griffin, president of Griffin, had addressed this vacancy, stating: "I would recommend putting Ann Stewart in the leadership role for both [Winston-Salem] offices." Affidavit of Peter Juran Exhibit 18 p. 4. In his notes about Stewart, John Griffin wrote, "I have mentioned to [Stewart] a transfer to Winston-Salem-it's an equal commute ... Ann will go to Winston if the money is in it for her...." Affidavit of Peter Juran Exhibit 18 p. 2. By the end of the year, Holland had opened five offices in North Carolina, each located in a city in which a Griffin office had been located.

**\*7** Holland began making placements for new clients in North Carolina during the week of December 14, 2001. The Trustee has presented evidence that tends to show that Holland quickly achieved placements with numerous former Griffin clients. For example, of the three clients that Holland serviced in its first week of operation, at least two, Fiber Composites and American Fiber, were Griffin clients. Two of Griffin's top five customers in Albemarle and one of Griffin's top five customers in Salisbury became Holland customers in Hollands second month of operation in North Carolina. Four of Griffin's top five customers in Concord became Holland customers in 2002. The Trustee has also presented evidence that, unlike Griffin, it was Holland's general policy not to make cold calls, that is, not calling on a potential client without a "hook" such as some relationship, connection or recommendation. In keeping with this policy, the evidence reflects that the Former Griffin Employees contacted former Griffin clients on behalf of Holland. For example, Stacy Almond testified that she took her sales notebook with her from Griffin, which contained her client contact information which she used to solicit placements for Holland.

In its defense, Holland primarily contends that it has not used any of Griffin's allegedly confidential Evaluation Material to compete in the North Carolina market. In its support, Holland has presented deposition testimony that the Evaluation Material was boxed up and stored immediately after the planned asset purchase fell through. Therefore, Holland contends that it is simply an indisputable fact that it never used the Evaluation Material for an impermissible purpose. Additionally, Holland contends that its expansion into North Carolina was ongoing, and was never contingent upon its acquisition of any of Griffin's assets. Holland had hired Joel McIntyre in March 2001, and he began calling on potential clients shortly thereafter. After the asset purchase fell through, Holland resumed the efforts it had begun in March 2001 with McIntyre. Therefore, Holland argues that its success in ultimately obtaining clients was a result of efforts that were entirely separate from the information it received from Griffin.

The Trustee has presented sufficient evidence of a breach of the Confidentiality Agreement sufficient to raise a genuine issue of material fact so as to preclude summary judgment for Holland. *See Static Control Components, Inc. v. Darkprint Imaging,*

© 2009 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

Page 7

Not Reported in B.R., 2005 WL 1287920 (Bkrtcy.M.D.N.C.)
**(Cite as: 2005 WL 1287920 (Bkrtcy.M.D.N.C.))**

*Inc.,* 240 F.Supp.2d 465, 483 (M.D.N.C.2002) (strong circumstantial evidence precludes judgment as a matter of law because reasonable minds could differ as to the misappropriation and use of trade secrets); *Byrd's Lawn & Landscaping, Inc. v. Smith,* 142 N.C.App. 371, 377, 542 S.E.2d 689, 693 (2001) (circumstantial evidence can be sufficient to support a trade secret misappropriation action). Therefore, as to this claim for relief, the court finds that neither party is entitled to summary judgment.

4. Breach of Contract against Almond

**\*8** The Trustee has also asserted a claim against Stacy Almond for the breach of her employment contract ("Employment Contract") which contained the following language:

[T]he Employee covenants and agrees that at all times during the term of this Agreement and for a period of eighteen (18) months after the termination of this employment for any reasons whatsoever, the Employee will not be directly or indirectly be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control of any business or enterprise which is engaged in the staffing industry including, but not limited to, temporary employment, temporary or regular employment, consulting or training in the staffing industry within a radius which is defined as 60 miles for the employee's usual market of responsibility area.

Upon termination of employment, the Employee shall, irrespective of time, manner, or reason for said termination, surrender to the Employer all lists, books, records and other materials of any kind (and any and all copies thereof) which related in any way to the Employer's clients or business, together with any and all property belonging to the Employer.

Almond does not contest the validity and enforceability of the covenant not to compete; therefore,

the only issue is whether she breached the Employment Contract. The evidence supports a finding that Almond did breach several terms of her Employment Contract. First, it is undisputed that Almond accepted employment with Holland within 18 months after the termination of her employment with the Debtor and Almond's employment was certainly within a 60 mile radius of her market area. Holland is clearly a business in the staffing industry. As a result, Almond breached her Employment Contract when she accepted employment with Holland. Additionally, Almond has admitted that she took her sales notebook with her to assist her while employed at Holland. This act was a clear breach of the requirement in her Employment Contract that she surrender to the Employer all lists, books, records and other materials of any kind which related in any way to the Employer's clients or business. Because the court finds that Almond breached her Employment Contract, the Trustee is entitled to partial summary judgment on the issue of liability; however, the Trustee must proceed to trial on the issue of damages.

5. Tort claims: Tortious interference against Holland and Unfair and Deceptive Trade Practices

In addition to the breach of contract claims, the Trustee has asserted claims for tortious interference with contract and unfair and deceptive trade practices against Holland. Before addressing the merits of these claims, however, the court will examine Holland's contention that the Trustee is asserting these tort claims as assignee, and tort claims are unassignable as a matter of law. There is no doubt that under North Carolina law, tort claims such as unfair and deceptive trade practices, personal injury, bad faith refusal to settle, breach of fiduciary duty, and tortious breach of contract are personal to a plaintiff and cannot be assigned. *See Investors Title Ins. Co. v. Herzig,* 330 N.C. 681, 413 S.E.2d 268, 271-72 (1992) (invalidating assignment of claims for unfair trade practices); *Terrell v. Lawyers' Mutual Liab. Ins. Co. of North Carolina,* 131 N.C.App. 655, 660, 507 S.E.2d 923, 926 (1998) (invalidating

© 2000 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

Page 8

Not Reported in B.R., 2005 WL 1287920 (Bkrtcy.M.D.N.C.)
**(Cite as: 2005 WL 1287920 (Bkrtcy.M.D.N.C.))**

assignment of claim for tortious bad faith); *Horton v. New South Insurance Co.,* 122 N.C.App. at 269, 468 S.E.2d at 859 (purported assignment of claims for unfair and deceptive practices, bad faith refusal to settle, breach of fiduciary duty, and tortious breach of contract is void). Because the assets of the Debtor were sold to Rolan on November 4, 2001, Holland contends that the claims asserted by the Trustee actually belong to Rolan. While Rolan did assign any claim it might have against Holland back to the Debtor, any purported assignment of personal tort claims would have been ineffectual.

**\*9** Nevertheless, Holland's argument is misplaced given the facts of this case. Holland's argument hinges on the premise that the claims asserted by the Trustee arose after the sale to Rolan and that the Trustee is asserting the claims only as assignee. The court finds, however, that the Debtor has direct claims that arose before the sale to Rolan that are properly asserted by the Trustee. The evidence presented reflects that Holland hired Former Griffin Employees prior to the sale to Rolan and Holland also had knowledge of the Former Griffin Employees' employment contracts prior to the sale. In addition, Holland sent the Former Griffin Employees back to the same city in which their former Griffin offices had been located to establish a Holland office prior to the sale to Rolan. The evidence could support a finding that the Debtor was directly damaged as a result of Holland's conduct when it negotiated a sale price dependant upon the future revenue of Rolan.

Turning to the merits of the interference with contract claim, the Trustee alleges that Holland interfered with the contractual relationships between Griffin and the Former Griffin Employees. The tort of intentional interference with contract has five elements: (1) a valid contract between the plaintiff and a third person; (2) the defendant has knowledge of that contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) without justification; and (5) actual damages to the plaintiff. *United Laboratories, Inc. v. Kuykendall,* 322 N.C. 743, 661, 370 S.E.2d 375, 387 (1988). Holland does not dispute the validity of Griffin's employment agreements, therefore, the Trustee has satisfied the first element of this claim. Second, the Trustee has established that Holland received notice of the existence of the employment agreements via counsel on October 19, 2001, and therefore, had knowledge of the employment agreements.

The third element and fourth elements are not so easily established. The Trustee must show that Holland intentionally induced the Former Griffin Employees to breach their employment contracts and that this was done with a wrong purpose. A wrong purpose exists if the act is done other than as a reasonable and bonafide attempt to protect the interest of the defendant involved. *Roane-Barker v. Southeastern Hospital Supply Corp.,* 99 N.C.App. 30, 38, 392 S.E.2d 663, 669 (1990).

The Trustee argues that the facts of the present case do establish Hollands intent and wrong purpose. The Trustee points to evidence that once hired, the Former Griffin Employees were told to target any work they could get, whether or not the work was with former Griffin clients. No efforts were made to have the Former Griffin Employees avoid their former Griffin clients, and now Holland is paying the legal fees for the employee who is now a defendant in the case, Stacy Almond. In fact, the Trustee asserts that Holland employed the Former Griffin Employees specifically to work in their prior territories and call upon their same customers. In response, Holland contends that it did not lure any employees away from Griffin and the evidence indicates that Holland discussed employment with the Former Griffin Employees only after their resignation from Griffin. Holland further contends that its expansion into Griffin's territory was justified, and not the result of a wrong purpose or intent.

**\*10** When the evidence supports two possible inferences, the intent of a party is a question of fact to be determined by a trier of fact. *United Laboratories, Inc. v. Kuykendall,* 322 N.C. at 664, 370 S.E.2d at 388. In this case, the court finds that the intent

Page 9

Not Reported in B.R., 2005 WL 1287920 (Bkrtcy.M.D.N.C.)
**(Cite as: 2005 WL 1287920 (Bkrtcy.M.D.N.C.))**

and purpose behind Holland's conduct are genuine issues of material fact that preclude summary judgment in favor of either party.

Lastly, the Trustee asserts that Holland's conduct violated the North Carolina Unfair and Deceptive Trade Practices Act (UDTPA). A claim for tortious interference with a noncompetition agreement by a competitor may also state a claim for unfair and deceptive trade practices under the UDTPA. *Id*. Since the same conduct gives rise to the tortious interference with contract claim as the cause of action for violation of the UDTPA, the same issues of material fact exist and the court must deny both motions for summary judgment as to this claim.

Based on the foregoing, an Order will be entered consistent with this Memorandum Opinion.

ORDER DENYING DEFENDANTS MOTIONS FOR SUMMARY JUDGMENT AND GRANTING IN PART THE TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

Pursuant to the Memorandum Opinion filed contemporaneously herewith, IT IS ORDERED, ADJUDGED, AND DECREED that the Motions for Summary Judgment by The Holland Group of Tennessee, Inc. and Stacy Almond are denied. It is FURTHER ORDERED that the Plaintiff's Motion for Summary Judgment is denied except as to the Plaintiff's claim for breach of contract against Stacy Almond, for which summary judgment is granted as to the issue of liability, leaving for trial the issue of damages only. It is FURTHER ORDERED that the Plaintiff shall, within 30 days of the entry of this order, properly serve Stacy Almond with a valid summons and a copy of the complaint.

Bkrtcy.M.D.N.C.,2005.
In re Griffin Services, Inc.
Not Reported in B.R., 2005 WL 1287920 (Bkrtcy.M.D.N.C.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.