THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:10-cv-00022-MR-DLH

THE HAMMOCKS, LLC d/b/a Richmond )
Hill Inn, Debtor-in-Possession, )
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiff, )
　　　　　　　　　　　　　　　　　　　　)
　　vs. 　　　　　　　　　　　　　　　　) 　　**O R D E R**
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
HARLEYSVILLE MUTUAL INSURANCE )
COMPANY, )
　　　　　　　　　Defendant. )
_____ )

**THIS MATTER** is before the Court on the Plaintiff's Motion for Judgment in Part as Matter of Law [Doc. 117].

**I.　PROCEDURAL BACKGROUND**

On March 19, 2009, an arson fire damaged one of the structures at the Richmond Hill Inn known as the "Mansion." After its insurance claim was denied, the owner of the Richmond Hill Inn, The Hammocks, LLC ("The Hammocks"), commenced this action against the insurer, Harleysville Mutual Insurance Company ("Harleysville"), alleging a breach of contract.[1]

---

[1] The Hammocks also brought causes of action for bad faith refusal to pay or settle an insurance claim, and for unfair or deceptive trade practices. [Complaint, Doc. 9-1 at

The Defendant denied coverage, alleging *inter alia* that the insurance policy was void *ab initio*, and/or that coverage was otherwise precluded because 1) The Hammocks, its members, or its affiliates caused the arson that destroyed the Mansion; 2) The Hammocks made material misrepresentations on its application for insurance; and 3) The Hammocks made material misrepresentations in the presentation of the claim, specifically with respect to the sworn proof of loss and the sworn testimony of member-manager William Gray ("Gray").

The case proceeded to a trial by jury on November 26, 2012. On November 29, 2012, the jury returned a verdict in favor of Harleysville, finding that The Hammocks had intentionally participated in the burning of the Mansion.[2] [Verdict Sheet, Doc. 115]. On December 12, 2012, the Court entered Judgment in favor of Harleysville based on the jury's verdict, declaring that Harleysville has no duty to provide coverage for the claim of loss tendered by The Hammocks and that the insurance at issue is null and

---

¶¶30-40]. Both of these causes of action were dismissed with prejudice prior to trial and are therefore not at issue here. [Order, Doc. 20].

[2] In response to the first issue on the Verdict Sheet, the jury found that there were no material misrepresentations made in the application for insurance. Because the jury found that The Hammocks had intentionally participated in the burning in response to the second issue, the jury did not reach the subsequent issues on the Verdict Sheet, including whether material misrepresentations were made in the presentation of the claim of loss.

void, under the terms and conditions of the policy, as a result of The Hammocks' intentional burning of the insured property. [Judgment, Doc. 116].

On January 7, 2013, The Hammocks filed the present Motion, seeking a partial judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, with respect to the issue of The Hammocks' intentional participation in the burning of the Mansion. [Doc. 117]. Harleysville filed a Response brief on February 4, 2013, opposing The Hammocks' Motion. [Doc. 125]. The Hammocks opted not to file a reply brief. [See Doc. 126].

Having been fully briefed, this matter is now ripe for disposition.

## II.  STANDARD OF REVIEW

Rule 50 of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). If the court does not grant a Rule 50(a) motion at trial, the movant may file a renewed motion for judgment as a matter of law within 28 days after the entry of judgment. Fed. R. Civ. P. 50(b).

A jury verdict will withstand a Rule 50(b) motion unless the nonmovant has presented no substantial evidence to support the jury verdict. Stamathis v. Flying J, Inc., 389 F.3d 429, 436 (4th Cir. 2004). A Rule 50 motion for judgment as a matter of law is reviewed under the same standard as that applied in reviewing a motion for summary judgment. Thus, in considering The Hammocks' motion, the Court must view the evidence in the light most favorable to Harleysville and draw all reasonable inferences in Harleysville's favor. See Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir. 2002). A verdict may not be set aside unless the Court "determines that the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party." Tools USA and Equip. Co. v. Champ Frame Straightening Equip., Inc., 87 F.3d 654, 656-57 (4th Cir. 1996) (quoting Winant v. Bostic, 5 F.3d 767, 774 (4th Cir. 1993)).

## III. DISCUSSION

The second issue on the Verdict Sheet presented to the jury states: "Did the plaintiff intentionally participate in the burning of the Richmond Hill

Inn Mansion?" [Verdict Sheet, Doc. 115 at 1]. In connection with this issue, the jury was instructed that the insurance policy at issue reads, in pertinent part, as follows:

> The defendant insurance company does not pay for loss caused by or resulting from criminal, fraudulent, dishonest, or illegal acts committed alone or in collusion with another by the plaintiff insured, others to whom the plaintiff insured entrusts the property, the agents of the plaintiff insured or others to whom the plaintiff insured entrusted the property, whether they are -- whether or not they are at work.

[Trial Transcript ("Trial Tr."), Doc. 120 at 179-80].

The jury was further instructed, in pertinent part, as follows:

> An insured who has intentionally participated, directly or indirectly, in the burning of property may not collect insurance for the loss or damage to that property. On this issue the burden of proof is on the defendant insurance company. This means that the defendant must prove, by the greater weight of the evidence, the following two things. First, that the Richmond Hill Inn Mansion was intentionally burned and, second, that the plaintiff limited liability company participated, either directly or indirectly, in the burning.
>
> \*   \*   \*
>
> Mere proof that the insured property was intentionally burned does not relieve the defendant insurance company from its obligation to pay under the policy. A Limited Liability Company may properly insure itself against a fire set by others without its knowledge or consent. The defendant

5

must prove that if the property was intentionally burned the plaintiff participated directly or indirectly in that burning. A person participates in a burning if he (a) burns the property himself; or (b) helps another burn the property; or (c) procures or arranges for someone else to do the burning; or (d) agrees with the person who ultimately sets the fire that the property shall be burned.

The defendant asserts that the plaintiff participated in the burning through the actions of William Gray. Whether the plaintiff Limited Liability Company participated in an intentional burning of its property depends on whether William Gray himself participated in the burning and, if so, whether William Gray was acting as a member manager of the plaintiff Limited Liability Company and on its behalf in such participation.

An intentional burning cannot be attributed to a Limited Liability Company unless it is established that the perpetrator acted with the Limited Liability Company's assent. Thus, if an individual who is not in control of the company's affairs participates in the burning of the premises without the complicity of the company, then that act is not attributable to the company. If, however, an individual participates in the burning of the premises and such individual was also vested with virtually exclusive management and control of the company's affairs, then the company must be denied recovery under the policy. Accordingly, if you find that William Gray participated in the burning of the Richmond Hill Inn Mansion, and that he did so, either with the assent of the company or while he had virtually exclusive management and control of the company's affairs, then the plaintiff must be denied recovery under the policy.

[Id. at 180-82]. As noted above, the jury answered this issue in the affirmative, thereby precluding recovery for The Hammocks under the insurance policy.

The Hammocks argues that there is insufficient evidence in the record to support the jury's finding that Gray acted as a member-manager of The Hammocks and on its behalf in intentionally burning the Mansion.[3] Specifically, The Hammocks argues that Harleysville failed to produce any substantial evidence to show that Gray was the only manager of the LLC; that Gray dominated or had exclusive control of the LLC's management; that Gray had a controlling membership interest in the LLC; that the other LLC members and managers had ceded exclusive control of the LLC's management to Gray alone; or that the LLC had "entrusted" the Mansion to Gray alone. [Doc. 118 at 7-14].

The Hammocks' argument that Gray had to be vested with "exclusive" control of the LLC is not supported by the law. The Court specifically instructed the jury that if it found that Gray participated in the burning of the Mansion and that he did so "while he had *virtually exclusive management and control* of [The Hammocks'] affairs, then [The

---

[3] In the present motion, The Hammocks does not appear to dispute that Gray was responsible for the burning of the Mansion, but rather contests only whether Gray's actions can be attributed to the LLC.

7

Hammocks] must be denied recovery under the policy." [Trial Tr., Doc. 120 at 182 (emphasis added)]. The requirement that Gray had to have "virtually exclusive management and control" of The Hammocks' affairs did not imply that Gray had to *dominate* or *completely control* the affairs of The Hammocks. By definition, the term "virtually" means "almost entirely" or "for all practical purposes"; it does not require complete domination and control. See Webster's Third New Int'l Dictionary 2556 (2002). Establishing a member's complete domination or control is simply not required by the law. See Kimball Ice Co. v. Hartford Fire Ins. Co.*,* 18 F.2d 563, 567 (4th Cir. 1927) (affirming jury verdict in favor of insurer where arson was committed by minority stockholder and general manager of corporation); K&T Enters., Inc. v. Zurich Ins. Co.*,* 97 F.3d 171, 177-78 (6th Cir. 1996) (rejecting the "complete" or "exclusive" control requirement on the rationale that it would (1) require proof that is very difficult except in the smallest of businesses, (2) would "encourage some corporate officers deliberately to remain blissfully ignorant of any plans for arson" by others, (3) would create incentives to disperse at least apparent authority in distressed corporations, and (4) would "encourage arson for profit").

The testimony adduced at trial from non-party fact witnesses, as well as The Hammocks' own members, established substantial evidence to

support the jury's finding that Gray had virtually exclusive management and control of The Hammocks' affairs at and around the time Gray intentionally burned the Mansion. For example, Margaret Michel testified that Gray retained a realtor, who in turn approached the Michels regarding the purchase of the Inn, and that Gray was the "point of contact" for the Inn's sale by the Michels to The Hammocks. [Trial Tr., Doc. 122 at 309, 311]. Virginia Love ("Love"), who was a member of The Hammocks and a lawyer practicing in Chattanooga, Tennessee, admitted that she had nothing to do with the negotiations for the purchase of the Inn. In fact, she was not even supplied with the Inn's financial information prior to its purchase. [Trial Tr., Doc. 121 at 117].

Evidence presented at trial also established that during The Hammocks' ownership and operation of the Inn, Gray infused money into The Hammocks, which not only resulted in Gray becoming an individual owner in The Hammocks, but also demonstrated Gray's significant personal investment in the Inn. [See Trial Tr., Doc. 121 at 106]. Gray's personal investment in The Hammocks also took the form of controlling the Inn's aesthetics by way of significant contributions of Gray's own antiques, art, and other valuables which Gray estimated to be "several hundred" items, which varied in value from $50 to $10,000. [Trial Tr., Doc. 123 at 71-

73, 97]. Further, while all of The Hammocks' members authorized its Chapter 11 bankruptcy, The Hammocks' bankruptcy attorney testified that it was his understanding that Gray was "authorized to act on behalf of The Hammocks with regard to [such] discussions." [Trial Tr., Doc. 122 at 41].

Further demonstrating Gray's control and management of The Hammocks was the testimony of James Sloggatt ("Sloggatt"), a member of The Hammocks, who testified that Gray demanded that Sloggatt deed over an adjacent tract to The Hammocks prior to its bankruptcy filing. [Trial Tr., Doc. 121 at 224]. When Sloggatt had not deeded the tract to The Hammocks by the time an order of foreclosure on the Inn was entered on March 16, 2009, The Hammocks retained Love's law firm to pursue a claim against Sloggatt. Love prepared a letter to Sloggatt on her firm's letterhead demanding that Sloggatt pay $9 million, which Love testified was per the request of Gray. [Trial Tr., Doc. 121 at 164, 176]. The $9 million dollar demand was the approximate amount that The Hammocks owed its creditors at the time. [Trial Tr., Doc. 121 at 177-78].

Additionally, multiple employees testified at trial regarding Gray's virtually exclusive day-to-day management and control of the Inn. Robert Gentry, a long-time employee of the Inn, testified that Gray "was always [at the Inn]. I know [The] Hammocks had a couple of additional people

involved with it. I only met them a couple of times. But Mr. Gray was pretty much on the property." [Trial Tr., Doc. 122 at 130]. Mr. Gentry testified that Gray was presented to him as the person in charge of the ownership of the Richmond Hill Inn, and that Gray made his control clear to the Inn employees. [Trial Tr., Doc. 122 at 130, 131].

Frank Comito, another employee of the Richmond Hill Inn, also confirmed that Gray was solely responsible for managing the Richmond Hill Inn. When asked who was responsible for "overseeing the [I]nn" after The Hammocks purchased it, Mr. Comito responded, "Mr. Gray." [Trial Tr., Doc. 122 at 249]. Mr. Comito went on to testify that "as far as a manager of the property and who was making the calls, it would be Mr. Gray." [Id.]

The documentary evidence admitted at trial provides further substantial evidence of Gray's virtually exclusive management and control of The Hammocks' affairs and of the Inn. The Fifth Amendment to the Operating Agreement of The Hammocks, which was in effect at all times relevant to these proceedings, named Gray as the sole member-manager of The Hammocks. [Defendant Trial Exhibit ("Def. Tr. Ex.") 17 at 1-2]. Gray's virtually exclusive authority is further demonstrated by other substantial documentary evidence, such as the October 2006 and 2007 modifications to the Michels' Note and Deeds of Trust, which were signed

11

by Gray. [Def. Tr. Ex. 10 at 3; Def. Tr. Ex. 156 at 2]. According to the LLC's Articles of Organization, Gray was the agent for service of process for The Hammocks and the only member identified as an individual in whom The Hammocks' management was vested. [Trial Tr., Doc. 121 at 273-74; Def. Tr. Ex. 1].

Documentary evidence admitted at trial further showed that Gray had control and authority with respect to The Hammocks' real estate transactions. In September 2005, Love and Sloggatt provided Gray with Powers of Attorney to act on their behalf with respect to the purchase of a tract of property located near the Richmond Hill Inn.[4] [Trial Tr., Doc. 121 at 111-17, 217-18; Def. Tr. Exs. 139, 168]. In February 2008, The Hammocks attempted to sell the Richmond Hill Inn property to Stonehouse Resort Properties, LLC. [Trial Tr., Doc. 121 at 168]. The documents associated with this attempted sale, most notably the agreement for the purchase and sale of the property, were negotiated and executed solely by Gray on behalf of The Hammocks. [Def. Tr. Ex. 122; Trial Tr., Doc. 121 at 269-71].

---

[4] The Hammocks argues that Love and Sloggatt's Powers of Attorney were unenforceable under North Carolina law because the original Powers of Attorney were never delivered or recorded. [Doc. 118 at 15-16]. Regardless of their enforceability, however, these Powers of Attorney are nevertheless relevant to showing the dominion and control that the other members of the LLC intended to bestow on Gray.

Communications by and between The Hammocks' Members, Love and Sloggatt, further showed Gray's virtually exclusive management and control of The Hammocks' affairs. As early as February 2006, Sloggatt e-mailed Love discussing his strained relationship with Gray, and notifying her that Sloggatt had "agreed to go through [Gray] for all future plans and purchases for the [Richmond Hill Inn]." [Def. Tr. Ex. 72 at 1]. In June 2006, Love stated in an e-mail to the longtime Innkeeper regarding the decision to terminate his position: "I felt like I just was not close enough to the situation to be able to act contrary when my verbal admonitions did not get anywhere. I know I am just too busy to try to replace [Gray] . . . ." [Def. Tr. Ex. 29 at 1].

After Gray burned the Mansion, documents show that he continued to act as the controlling manager of The Hammocks. Gray was the only member to sign The Hammocks' original and amended bankruptcy petitions. [Def. Tr. Exs. 84 at 2, 85 at 2]. Gray signed the Sworn Proof of Loss submitted to Harleysville for The Hammocks, and Gray served as the Member Manager of The Hammocks to give testimony on behalf of The Hammocks at the Examination under Oath conducted by Harleysville. [Trial Tr., Doc. 123 at 138, Doc. 121 at 257; Def. Tr. Exs. 151A at 1, 151B at 1, 151C at 1]. The foregoing testimony and exhibits presented

substantial evidence from which a reasonable jury could find that Gray maintained virtually exclusive control and management of The Hammocks' affairs up to and through the date that Gray burned the Mansion.

In making its Rule 50(b) Motion, The Hammocks relies heavily on the fact that Gray was not a majority owner in The Hammocks and therefore argues that Gray did not have the right to act on The Hammocks' behalf when he burned the Mansion. It is undisputed that Gray effectively maintained a 42% ownership interest in The Hammocks. The fact that Gray was not a majority owner, however, is not determinative of whether Gray had "virtually exclusive management and control" of The Hammocks' affairs at the time Gray burned the Mansion. Indeed, it has long been recognized that a minority shareholder can have sufficient control over a company's affairs for his or her arson to be imputed to the company. See, e.g., Vicksburg Furniture Mfg., Ltd. v. Aetna Cas. & Sur. Co., 625 F.2d 1167, 1170 (5th Cir. 1980) (concluding that evidence supported insurer's defense of "corporate arson" where there was evidence indicating that one of officers, who was also a director and 25% shareholder of the corporate insured, had control of the company's affairs); Kimball Ice, 18 F.2d at 565-67 (denying recovery by insured where arson was committed by minority shareholder who also served as general manager of the company).

The Hammocks argues that the jury's verdict lacks sufficient evidentiary support because there is no evidence that there was a supermajority vote of The Hammocks' members authorizing Gray to burn the Mansion. [Doc. 118 at 14-15]. Contrary to The Hammocks' argument, however, there is no requirement that formal authorization by a supermajority of The Hammocks' members be established in order to show assent to Gray's intentional burning of the Mansion. Rather, as the Court noted in its instructions [Trial Tr., Doc. 120 at 182], circumstantial evidence such as motive may be proof to show a corporate entity's assent to arson. See Cora Pub, Inc. v. Continental Cas. Co., 619 F.2d 482, 486 (5th Cir. 1980) (recognizing that "proof of corporate assent to arson . . . is not likely to be found in the archives of the corporation" and so insurers may prove arson by a variety of methods, including circumstantial evidence).

Here, Harleysville presented substantial evidence at trial with respect to The Hammocks' financial motive to burn the Mansion. Between 2006 and 2008, The Hammocks operated at a loss of over a million dollars per year. [Trial Tr., Doc. 121 at 202]. In the months preceding the arson, The Hammocks faced foreclosure on the property by the previous owners, the Michels, and The Hammocks' members were contemplating bankruptcy. [Trial Tr., Doc. 121 at 148-49]. Unable to obtain financing, The Hammocks'

members were forced to make personal contributions to help finance the Richmond Hill Inn's operations. [Trial Tr., Doc. 121 at 157]. An attempt to sell the property for $8.8 million fell through in August 2008. [Trial Tr., Doc. 123 at 91, 93]. In February 2009, The Hammocks was notified that Buncombe County would initiate foreclosure proceedings for The Hammocks' failure to pay property taxes unless payment was made within 14 days. [Trial Tr., Doc. 121 at 264; Def. Tr. Ex. 154]. On March 16, 2009, following months of proceedings on the pending foreclosure by the Michels, the Buncombe County Clerk issued an order allowing a foreclosure sale of the Inn within a few weeks. [Trial Tr., Doc. 121 at 264-65]. When the fire occurred three days later, The Hammocks owed approximately $7.9 million to creditors, including $6.9 million on the Note to the Michels. [Def. Tr. Ex. 84 at 3, 4]. In addition, The Hammocks owed approximately $1.1 million in unpaid state and federal taxes. [Trial Tr., Doc. 122 at 53-54; Def. Tr. Ex. 71]. This evidence constitutes substantial evidence of The Hammocks' financial motive to burn the Mansion and recover over $6 million in insurance proceeds.

For the foregoing reasons, the Court concludes that there is substantial evidence from which the jury could have reasonably concluded that The Hammocks intentionally participated in the burning of the insured

property.  Accordingly, The Hammocks' motion for a partial judgment as a matter of law is denied.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Judgment in Part as Matter of Law [Doc. 117] is **DENIED**.

**IT IS SO ORDERED.**   Signed: April 29, 2013

Martin Reidinger
United States District Judge